[No. 2130.]

JAMES LIGHTFOOT v. THE STATE.

MURDER — CORPUS DELICTI — FACT CASE.— See the statement of the case for evidence *held* insufficient to support a conviction for murder in the first degree, because it fails to establish the *corpus delicti* either as to the identity of the body found as the body of the deceased as alleged in the indictment, or that death resulted by the means alleged in the indictment. Having alleged that the deceased was killed by shooting, the State was bound to sustain the allegation by proof.

APPEAL from the District Court of Henderson. Tried below before the Hon. F. A. Williams.

The indictment charged the appellant with the murder of George Pitman, in Henderson county, Texas, on the 7th day of August, 1882. The conviction was for murder of the first degree, the penalty assessed being a life term in the penitentiary.

Doctor P. E. A. Williams was the first witness for the State. He testified that he saw a dead body in Coon creek on the 19th day of August, 1882. The head, one hand and part of one foot were off and gone. There were some six or seven holes in the body. It appeared to be the body of a white man, but the witness believed it to be the body of George Pitman, a negro, and the man who is named in the indictment as the deceased. The witness based his opinion upon the size and shape of the body, which corresponded with that of Pitman. The growth about the privates was negro wool. Witness thought he could identify the breeches found on the body as those of George Pitman, the alleged deceased. The breeches found on the body were rolled at the ankles, and Pitman usually wore his pants so rolled. Pitman had suffered in life-time with the phthisic, and had been medically treated for that disease. He had been several times, during his treatment, blistered on the breast, and those blisters in healing had left scars. There were large and small scars on various parts of the body found, and by those,

and other scars, from cuts on the arms, the witness thought he could identify the body as that of George Pitman. Decomposition had made some progress on the body when the witness saw it. The reason why the body was white in color was that decomposition rendered the cuticle or *epidermis* easily removed, and, in the opinion of the witness, it was removed by fish or brush, or some other agent of the like. The witness saw where two horses had been hitched some one or two hundred yards from the point where the body was found. A rain had fallen since they were hitched there, and had partially obliterated the tracks. The witness saw, in the sand, near the horse tracks, evidences of a scuffle. Two watermelon rinds were found near that point, and appeared to have been there several days. Witness thought that the holes in the body were made by buck shot. They went straight into the breast, but did not pass out. The witness introduced a stick six or seven inches into the several wounds, penetrating the lungs; the stick meeting with no resistance. There was a large hole in the pit of the stomach through which buzzards had picked or dragged entrails. The body, when found, lay partially on a drift in a large lake. At a short distance above the body a large log extended from the bank of the lake into the water. Just above the log the witness saw in the mud the impression of a large, flat, bare foot.

Cross-examined, the witness testified that the place where the ground indicated a scuffle was about ten feet distant from where the body was found. The coloring substance, or that property which gives the black color to a negro, is held by the muscles and tissues. The body found in the lake was entirely white, without a single black spot. The *epidermis* is opaque, and is not so durable as the true skin. There were no holes in the back of the body, and if those on the breast were made with buck shot, none of them passed out of the body. The witness could not say that the breast bone or any of the ribs were or were not broken. The track at the end of the log indicated that the person who placed his foot there kneeled over, with his hand on the log, to take a drink of water. The witness did not like the defendant either at the time of the alleged murder or at the time of his trial. He spoke to defendant when he met him, but never stopped to converse with him. He had never had a difficulty with the defendant. The witness could not say that the holes in the body were made before or after death. If made while the person was in life, they were amply sufficient to produce death. He did not know that the buzzards had been picking at or feasting upon the body, but he did know that the fish and

turtles had removed the flesh from the calves of the legs and from some parts of the body. Witness could not say that the body was that of a man who met his death at the lake or in Henderson county, or whether the body was brought from some other place and thrown into the lake. Balls could pass through a body between the ribs without fracturing any bones.

Alice Pitman testified, for the State, that she was the wife of George Pitman when he disappeared. Witness saw her husband last in life on the 7th day of August, 1882. Afterwards a body was found in Coon creek, and the witness was sent for to view it. The head was missing and has never been found. The witness identified the body as that of her husband George Pitman. She identified it by means of a scar which was made in childhood by a burn, and by certain patches on the pants found on the body which she herself sewed in the pants. She could not mistake other patches for her own. Those patches were in the knees of the pants, and were of material as nearly the color of the pants as the witness could get. The pants were of a brown color. The broken bowl of a pipe and a cane stem were found in the pockets of the pants on the body, and witness identified them as the property of George Pitman. George Pitman had been missing about twelve days when the body was found in the lake.

The defendant and George Pitman went from the field to Pitman's house together, about 10 o'clock on the morning of August 7, 1882. They said that they were going bee hunting. Defendant went on to his house, about four hundred yards from Pitman's, whither, in the course of an hour, Pitman followed on horseback. Witness next saw the defendant at his house about an hour by sun on that same evening. Witness's mother, who was at defendant's house, sent for the witness. On witness's arrival the defendant told her that he had purchased George's crop, horse, hogs, and everything else he had, and that George had gone to Mr. Cummings's to pay Bob Seahorn what he owed him on the crop. He told witness that he paid Pitman $350 for his property, getting part of the money from Mr. Cummings, and adding to that the money that he had on hand; that he had loaned the horse to George to ride to Cummings's, and that George would bring him back either that night or the next morning. He told the witness that he had a bill of sale to everything except the household plunder. He went to the witness's house with a wagon and got the plows and hoes, etc., and drove the hogs off. When witness next saw Pitman's horse he was in the defendant's lot, and the defendant claimed him. The defend-

ant and George Pitman went bee hunting on Saturday, Sunday and Monday. Witness saw on the breast of the body found several holes about the size of the end of her finger. She saw a scar on the breast, but it was so torn she could tell nothing about it. She saw also, near an old log which extended into the lake, the impression made in dragging some heavy body to the creek. She saw the track of George Pitman near the creek. Pitman always wore his pants rolled up at the ankles. Witness recovered the hogs, horse, etc., the next day after the inquest.

Cross-examined, the witness said that she saw her husband on his way to the defendant's house on August 7, until he got to the intervening woods, beyond which woods the defendant's house could not be seen. Pitman had left his gun at the defendant's house on the preceding Saturday. Witness did not see George's gun at the defendant's house, but, as he did not bring it home from his Saturday bee hunt with the defendant, she knew he must have left it at defendant's house. The defendant and George had always been on intimate terms, so far as the witness knew. Witness followed George half way out to the gate when he started to defendant's on August 7, and had a long conversation with him about a threat of his, previously expressed, to leave the witness and go to Little Rock, Ark., in search of his son. He told witness in that conversation that he would not leave her, and would not sell out to the defendant. Witness and Pitman had a quarrel on the day before, but were friendly at that last interview. Witness did not recollect testifying on the *habeas corpus* trial that she and her husband were unfriendly on that Monday morning. Witness knew that the defendant had been trying to buy George's crop. Witness did not see the scar of the burn when it was made on George's breast, but was told by him that the scar was the result of a burn he endured in his childhood. The body found showed a scar on the small of the back, and another on the breast, but they were so badly torn that witness could tell nothing about them. The arms of the dead body showed fresh cuts, but no scars from old cuts, and there were no scars of old cuts on George's arms. The witness heard of but knew nothing about George and Allston Reynolds having a fight five or six days before George's disappearance. Witness could not say how the person whose body is under discussion came to his death, but thought that he was shot. Witness saw no signs of buzzards. The hands were off, and the right arm was broken just below the elbow. The bowl of the pipe, save the elbow which held the stem, was shattered. Witness did not remember that on the *habeas corpus*

trial she testified that the defendant claimed to have procured the entire $350 from Mr. Cummings. The body was found in Henderson county, but witness and her husband lived in Anderson county. Witness could not say that the body was that of a man killed in Henderson county. Witness did not know at what hour the defendant got back home on the 7th day of August, but she saw him there at about an hour by sun. Witness did not, as a fact, know that he went off with George, bee hunting, on that day, but when they came out of the field on that morning they said they were going out bee hunting. The body found was buried on Coon creek, near the place where it was found. Witness was at the defendant's house between 1 and 2 o'clock on Monday, August 7, but did not then see defendant.

A. W. Pines testified, for the State, that he was at Big Lake, on Coon creek, fishing, on Tuesday, August 8, 1882, the day after George Pitman was last seen alive. Three or four fishing lines were there in the water, secured to the bank. He saw a large foot track, but could not now remember whether it was flat or hollow. He saw indications on the ground of some body or some thing having wallowed there. His conclusion was that somebody had been bathing in the lake. He saw also two watermelon rinds. Witness saw these evidences of the recent presence of some person, about 3 o'clock on the evening of August 8, 1882.

Cross-examined, the witness said that he was enabled to locate the date with certainty by the fact that he had heard that George Pitman was missing, and made a note of the day. The watermelon rinds looked like they had been at the point mentioned but a few hours. Mr. Moon was with the witness at the lake on the day referred to. Witness and Moon went to the lake with a horse, wagon and a yoke of oxen; got there at about 3 o'clock P. M., and remained over that night. They saw no blood about the ground, nor did they look for any. Had there been any blood about, witness thought that he and Moon would have seen it. The lake was much frequented by fishing parties, and horse tracks up and down the creek, and to hitching trees, were very common.

Re-examined, the witness said that a large log extended from the bank into the lake at one point, and it was near the land end of the log that the witness saw the indications of wallowing. Witness and Moon spoke of the matter at the time, and expressed the opinion that somebody had recently been in swimming. Some one else present expressed the opinion that some one had suffered a fit and fallen into the lake from that point.

Monroe Hallam, colored, testified, for the State, that in 1882 he lived about one and a half miles from the defendant. He remembered the disappearance of Pitman. Witness had a conversation with the defendant on Tuesday, the day after the disappearance of Pitman. Defendant came to the place where witness was splitting rails, and said that he had bought Pitman's crop, horse, hogs, etc., for $300. Witness asked him where he got the money, and he said that he had it. Witness then asked him if he had not paid a big price for the property. He replied that the price was not too much, as the horse was worth $100. He further told witness that he loaned the horse to Pitman to ride to Cummings's place, to pay Seahorn what he owed on the crop; that Pitman brought the horse back and slept in his fodder house the night before, and left for Athens early that morning on his way to Arkansas, and that he, defendant, at that time, was hunting the hogs he had bought from Pitman.

Cross-examined, the witness testified that he was with the party which, about two weeks after Pitman's disappearance, found the dead body at Big Lake. George Pitman was a dark, ginger-cake colored negro. The body found was white, except a few black spots on the back. Witness was certain that there was one black spot on the body. Witness saw Doctor Williams examine the body, and turn it over in doing so. Witness made no personal examination of the body, but noticed that it had on pants, and that one arm was broken. Witness was not immediately with the party when the body was first discovered, but came up very shortly afterwards. Witness saw the signs of buzzards about.

Sam Mays testified, for the State, that on Tuesday after Pitman was missed, the defendant came to his house and said to witness: "I have bought George out." The witness replied: "Shucks!" Defendant said: "You don't think I am telling you a story?" Witness said: "No." Defendant said that he paid Pitman $300 for his property, and that he borrowed the money from Mr. Cummings to pay him, and that Pitman had gone to Arkansas. Defendant wanted to trade the horse for witness's mule. Two or three weeks before that, the defendant told witness that he had done more work on the Shaddick and Seahorn crop than "they" had, and that he intended to get Pitman away from there. The witness and a colored man named Box were at defendant's house on Sunday, and found the defendant and Pitman there, getting ready to go bee hunting. Pitman asked witness to go, but, as defendant said they were going to spend the day, witness declined. This, the witness thought, occurred about a week before Pitman disappeared.

Cross-examined, witness said that he knew the conversation with the defendant about the purchase of Pitman's property occurred on Tuesday, but he did not remember the day of the month. Pitman was missed, according to witness's information, on Monday, but witness did not hear of it until the succeeding Wednesday or Thursday. The other conversation (about going bee hunting) occurred two or three weeks before, at defendant's house. Witness and defendant were then friendly. Defendant came to see witness, and witness went to his house. Witness did not exactly *visit* the defendant, who was a white man, but was on his place often. Witness was present at the finding of the body, but staid only long enough to glance at the body. When found, the body was nearly under the water.

John Dunlap testified, for the State, that he was one of the party which found the dead body on Coon creek. The defendant was at witness's house on the Saturday prior to the Monday that Pitman disappeared. Defendant rode home with witness from a mill, and on the road asked witness to lend him some strychnine. Witness had some which he had borrowed from Mr. Hanks, and did not like to lend it. However, when they reached home, witness agreed to let him have some. Witness told defendant that he did not know how to fix the strychnine on wolf bait. Defendant replied that he did, and would show witness, which he did, preparing some goat liver witness had preserved. He left after a short time with some strychnine and a piece of the liver.

Cross-examined, the witness testified that wolves were at that time very troublesome to his stock, and the defendant told him that they were likewise depredating upon his. Pitman was a dark ginger-cake colored negro,— not what the witness would call a real black. Witness was with the party that found the dead body in Coon creek, and thought the color of that body too light for Pitman. Witness saw some holes in the left side of the body, but none on any other part of the body, though he did not examine for others. The defendant and Pitman both lived in Anderson county, but the body was found in Henderson county. Witness did not know when, where nor how the person whose body was found came to his death. He did not know whether the holes in the body were made before or after death. He thought it possible that the holes were made by buzzards. Witness saw no scars on the body. The head was never found so far as the witness was aware.

T. J. Leaton testified, for the State, that recently before Pitman's disappearance the defendant came to him at Cummings's place and

asked for some strychnine. Witness asked him what he wanted with it. After some hesitation he said that he wanted it for biting dogs. He said nothing about wolves. Witness did not supply him.

M. C. Cummings testified, for the State, that he knew the defendant and George Pitman. Jim Shaddick and Bob Seahorn cropped with Pitman in 1882. The witness had a talk with the defendant in the peach orchard at his, the witness's, house on the Friday before the disappearance of Pitman. Witness told defendant that Murchison, Shaddick and Seahorn would hold the crop for the purchase money due from Pitman to them. The conversation was about the defendant's proposed purchase of Pitman's share in the crop, but witness was not certain whether the subject was introduced by himself or the defendant. The witness had heard of a rumor that defendant was contemplating the said purchase. T. J. Leaton was at witness's house when this conversation took place. During his stay at witness's house on that occasion, defendant asked witness if he had any strychnine. Witness replied that he had none, but that Mr. Leaton had some. On the Tuesday or Wednesday after the disappearance of Pitman, Bob Seahorn got witness to go and see defendant and ascertain whether defendant would pay him for Pitman's crop. Witness, on the said day, saw the defendant at his own house. He told witness that he had bought the crop from Pitman and paid for it, and could not pay for it again. Witness advised him to pay Seahorn. Defendant did not borrow money in any amount over one or two dollars from the witness in 1882. Witness loaned money prior to 1882, but was not lending during that year. Witness went to the big lake after the body was found but before it was taken out of the water. It had drifted down to the lower part of the lake. It was not taken out of the water until the morning after it was found. Quite a number of persons were present when the body was taken out of the water. Witness and others took the body out by slipping a blanket under it. It had the appearance of having been dead for several days. The outside pants were an old patched pair, rolled up at the ankles. Under these pants was another pair, or a pair of drawers. The body was considerably decayed. The skin was off the breast, on which there was no shirt, and the breast had several holes in it. One of the hands was missing. The flesh about the private parts was torn off. If compelled to express an opinion, the witness would say that the body was that of a negro. Witness saw a scar about the small of the back on the body. A pipe with a cane stem was turned out of the pocket.

Cross-examined, the witness testified that the defendant did not say, when he asked for it, what he wanted with the strychnine. The defendant had a home place with as much as sixty acres under cultivation, and owned the house in which George Pitman lived. He, defendant, was a thorough-going working man, and the witness did not think it at all probable, though it was possible, that he had as much as $300 on the 7th day of August, 1882. Defendant's credit was good, and the witness would have trusted him at that time. Defendant had owed the witness as much as $125 at a time, and was always prompt to pay. The witness did not join in the search for the body. Defendant lived on a straight line southeast from the point on the lake in Coon creek, where the body was found, and about five miles distant. Catfish creek was a larger body of water than Coon creek, and was about one and a half miles distant from defendant's house towards Coon creek. Witness lived about three miles nearly north from the defendant. Witness made a fairly careful examination of the body. He saw some holes in the body, but could not tell how nor when they were made. The body had been dead a long time, and was soft enough for the buzzards to have forced their beaks through. Witness inserted a stick into each of the holes about six inches, and sounded the chest, without discovering any evidence that any of the ribs or bones were broken. There was a much larger hole at the pit of the stomach than elsewhere on the body. One of the bones of one of the arms was broken near the wrist. It was broken obliquely. There were no holes in the back. · The b)dy was lying back down when the witness saw it. The witness thought that if the holes in the breast were made with a shot-gun, the gun must have been fired from a very short distance,— not over ten or fifteen steps away, and in that event witness thought the balls or shot would have passed through the body, and would have broken the breast bone and ribs. That, however, would depend much upon the gun and the manner in which it was loaded. The witness once saw a man shot with a shot-gun at about twelve paces, and the shot passed entirely through his body, and made a large hole at the point of exit. The head of the body was never found. It was square off, and left the neck bone protruding. No signs of a knife cut were visible about the neck, and there were no shattered bones about it, indicating the use of a gun. The body was buried near the point on the lake where it was found. The country from Catfish creek to Coon creek was a sand flat country, and would not retain tracks as well as stiff land. George Pitman was a large, full breasted negro, about five feet eleven inches in

height. The buzzards had evidently been at the body. Witness noticed the log described by previous witnesses, and the foot track near it, also horse tracks where horses had been hitched, and watermelon rinds. There had evidently been much travel about the lake by parties fishing.

M. Nicodemus testified, for the State, that he was at the defendant's house a short time after the disappearance of George Pitman, and had a conversation with him, in the course of which he told the witness that he had bought Pitman's crop and other property, paying $300 for the same. He did not tell the witness where he got the money. Witness was with one of the parties that searched for the body. Two parties engaged in the search. Witness, Pickel and Landers searched Catfish creek as far as Rheims's farm. On the next day they went to the Tennessee colony in Anderson county. Witness went with a party again on the next day to the old Dred field, on Catfish creek, where the party scattered. Witness and those with him struck a horse trail shortly after the party divided, and trailed it to a break in the direction of Coon creek. They struck Coon creek some little distance above the big lake, and dragged the holes. Thence they searched down the creek, and found the body lodged against a drift at the big lake. They found horse tracks near a log in the creek, and the place gave evidence that a body had been rolled into the creek. Witness merely looked at the body when it was first found,— did not examine it. The head was gone. There were holes in the breast somewhat larger than bullet holes. The big lake was about four miles from the old Dred field, and that field was about two miles from defendant's house. The tracks followed were of two horses, one large and one small. They sometimes traveled in single file, and sometimes side by side. Bee bait was found on the creek at a point above where the body was found. Defendant said nothing to witness about bee hunting when he told witness that he had bought Pitman's property. Witness did not notice to see whether or not the tracks of the horses hitched near the point where the body was found were the same tracks he had trailed or not.

Cross-examined, the witness said that, before the body was found, the woods got full of men hunting for the body. The bee bait spoken of by the witness was found at the edge of the brake, a mile and a half or more from the point where the body was found. The horse tracks were found on the eleventh day after Pitman was missed. Witness knew of no loose horses running in that range. Catfish creek was searched on the day that the defendant was ar-

rested, which was before the body was found. The large track described by previous witnesses was at the point on the lake where the body or some other heavy substance was rolled into the creek. The body was nearly yellow in color, and did not suit Pitman's nearly black color. Witness did not know when nor how nor whether the buzzards could or could not have made the holes in the breast.

D. D. Hanks testified, for the State, that he joined in the search when the examining trial of the defendant adjourned. The party he was with began the search at the defendant's house. Thence they went to Catfish creek, crossed it and found horse tracks which, after following them a half mile, they abandoned, and went to Coon creek and dragged the holes. They finally met Mr. Gage, who told them that he had seen buzzards at a point on the creek near the big lake. The party went there and found the body, but did not take it out of the water until the next morning. The head and one hand, and perhaps both hands, were off and missing. A pair of pants, rolled up at the ankles and patched and repatched, and the part of a shirt, were on the body. Several holes were in the breast. One of the horse tracks followed was a large round track, such an one as was made by Pitman's horse. The other was a small track. Defendant owned a pony. Witness had known the defendant a long time. Defendant had some horses, hogs and cattle and a good piece of land, and was generally supposed to be making money. Witness saw horse tracks near where the body was found, but could not say they were the same trailed from Catfish creek towards Coon creek.

Cross-examined, the witness said that the horse trail was abandoned by the searching party when they concluded them to be the tracks of defendant's and Pitman's horses, and became satisfied they led direct to Coon creek. They did not know as a fact that the track of one of the horses was the track of Pitman's horse. Witness did not see any bee bait, but did not notice for any. Forty or fifty, and perhaps sixty, men were engaged in the search, at various points. Witness did not look at the body after it was taken from the creek on the morning after it was found. The pants on the body were patched at many places other than on the knees. There was not enough of the shirt on the body to show whether or not that garment had been patched. Witness thought that the shirt was originally striped hickory. Defendant had a wife and four small children when Pitman disappeared. His wife has since died.

W. M. Pickel testified, for the State, that he was at the defend-

ant's house on the morning of Monday, August 6 or 7, 1882. Just as he was leaving he saw George Pitman approaching from towards his house, and waited at the gate to see him on business. After a twenty-minutes conversation with Pitman, witness started home, and, as he left, he heard Pitman ask defendant if he was ready. Witness turned and saw defendant going towards his horse lot. During the conversation with Pitman at the gate, Pitman agreed to commence digging a well for the witness one week from that day, and proposed to witness to live with him the next year. Pitman had a gun with him on that occasion. He did not tell the witness where he was going. A few days after the disappearance of Pitman, a crowd met at the old Dred field to search for the missing man. Witness was one of the number. They found horse tracks on Catfish creek opposite the old field, and followed them towards Coon creek. The track of the large horse showed a broken place in the hoof, such as Pitman's horse had. One of the tracks was small, and defendant then owned a small pony. They followed the tracks to the edge of the brake, where they were lost in the multitude of other tracks. Thence they went to Coon creek and searched the water holes until they found the body at the point described by previous witnesses. Witness described the body, clothing and appearance of the ground about as other witnesses did.

Cross-examined, the witness said that he was enabled to fix the date of his interview with Pitman by means of contracts made on the same day. Witness and Pitman entered into no contract for the next year, and deferred further discussion of the matter until Pitman should come to dig the well. Witness was certain that Pitman had his gun with him when he reached defendant's house about noon on that Monday. A great many men participated in the search, but witness could not remember the names of all. Hanks and Nicodemus were with witness's party. Witness did not know of his own knowledge that Pitman's horse had a notch in one foot. Notches in the feet were not uncommon to horses. Some horses ran loose in the neighborhood of the trail followed by witness and party. Witness's attention at the lake was first attracted by the disturbed place on the bank of the lake, which looked like a body of some kind had been rolled thence into the water. A large foot track was near that point. Witness saw no shirt or part of a shirt on the body. The exposed part of the body resembled rawhide with the hair removed. It was white in color. The missing man was a negro, but was not jet black. Witness saw one scar on the hip, and thought there were other old scars on the body. Of the

several holes in the breast, two or three were in or very near the center. Witness saw no blood about the lake. The body was found in Henderson county, but witness did not know how it came there. Pitman had his pants rolled up when witness saw him at defendant's house on Monday, and remarked that he hoped to be able to wear better clothes some day. A broken pipe with a short cane stem was found on the body. Witness noticed no notch in Pitman's horse's foot on Monday when he saw him at defendant's house. Witness saw Pitman at defendant's house just about noon on that Monday.

Bob Seahorn testified, for the State, that he made a crop on the defendant's place in 1882, which crop he sold to Pitman in July. Prior to that sale witness told defendant that he wanted to sell, and defendant told him that he thought he could sell to Pitman. Pitman hoed cotton for witness several days, after which witness sold him the crop on credit. Pitman had not paid witness for the crop when he disappeared, and witness went to see defendant about it. Defendant told witness that he had bought the crop from Pitman, and asked witness if Pitman had paid him for it. Witness replied that he had not, and that he had not seen Pitman. Defendant then told witness to stay away from his place, or he would kill witness. Witness replied that he could not be frightened off, and that he was going to have either his crop or pay for it. Jim Shaddick started in to make that crop with witness, but witness bought him out. Defendant and witness fished and hunted together, and in the spring of 1881 defendant told witness where some money was said to be buried, and proposed to witness to go with him to unearth it.

Cross-examined, the witness said that he, Landers and others were present in the cotton patch when Pitman and Allston Reynolds had a quarrel some two or three weeks before Pitman disappeared. Pitman and Reynolds cursed and threatened each other violently. Witness had never heard George Pitman speak of going to Little Rock, Arkansas. Pitman and his wife did not get along well. They had several fights to the knowledge of the witness. The difficulty between Pitman and Reynolds was about the former's wife. Landers interfered and separated Pitman and Reynolds. They scratched and pushed each other. Witness's interview with the defendant about the crop occurred a short time after Pitman disappeared. It was a moderately stormy interview. Defendant, at the examining trial, authorized witness to take charge of his part of the crop.

Polser Kale testified, for the State, that the defendant came to his

house early on the morning of Tuesday, August 8, 1882, took a seat, and said: "Uncle, I have bought old George out." Witness in reply asked: "Have you, Jim?" He said: "Yes, lock, stock and barrel." Witness asked him the price he paid. He replied that he paid $225; that George demanded $300, but finally fell to $225. Witness then asked defendant if George had paid Seahorn for the crop. He replied that George went to Mr. Cummings's to pay Seahorn, and came back and said that he had made the payment. He told witness that a negro brought the horse he bought from George to his place that night, tied him in the field, and that the horse got loose and tore down some of his corn. He then asked witness to sign a bill of sale from George to the said property, as a witness. Witness declined upon the ground that he did not witness the sale. He insisted upon the witness signing it, assuring him that it would be all right. Witness refused to sign and did not sign the bill of sale. According to witness's recollection, the defendant told him that he got the money to pay George from Mr. Cummings. The bill of sale which he asked the witness to sign bore the date of August 7, 1882.

Cross-examined, the witness said that he saw the bill of sale. He could not remember that George Pitman's name was signed to the bill of sale, but did know that it had an X mark. Defendant's wife wrote that bill of sale. She was the witness's niece, and witness knew her handwriting. The instrument was not in the usual form, and witness could not remember whether or not it named the consideration. Witness was out bee hunting on the Saturday before the disappearance of Pitman, and saw the defendant and Pitman out on the same business. They were then on the public road near the old Dred farm. Pitman had his gun on that occasion.

W. F. Neff testified, for the State, that he was the book-keeper of the firm of Murchison & Coleman, and was so employed in August, 1882. Defendant had an account with Murchison & Coleman during the year 1882, for goods purchased by him on credit. He was furnished goods as he wanted them, but at times was required to place good security.

Cross-examined, witness said that security was but once demanded of the defendant. He always paid promptly until he was jailed in 1882, before he paid off his account of that year. He had never settled that balance.

M. C. Cummings, recalled by the State, testified that the growth about the privates of the body was wool or kinky hair. It was curly and kinkier than the hair which grows about the privates of a

white man. The witness, in deciding in his own mind that the body found was that of a negro, based his belief more upon that wool or hair than upon anything else. A swallow-fork was broken from the front of the pipe found on the body.

Cross-examined, the witness said that he was not very familiar with the character of hair that grew about the privates of negroes, and could not positively say that the body was that of a negro. Witness remembered the general jail delivery at Athens, when the defendant with other prisoners escaped. He met the defendant a short time after that between Athens and his, witness's, house, and had a short talk with him. Defendant said that he was on his way to Athens to surrender and stand his trial. He said that the sheriff had sent him a blank bond to be filled, but that he knew his was not a bailable case, and that he was going to stand his trial.

Re-direct, the witness said that the defendant asked witness to visit him in jail, and said that he would convince the witness that he was innocent. He said nothing about new developments. Witness promised to call, and did so after the defendant was placed in jail, but as several others, including the jailer, were present, he failed to get a private talk with defendant.

Alice Pitman, recalled by the State, testified that the defendant did not tell her where he and George Pitman traded, except that their contract of purchase and sale was made while bee hunting. Witness had never since seen her husband's gun. The State closed.

Jacob Henderson was the defendant's first witness. He testified that he was with the searching party which comprised Hanks, Pickel, Nicodemus, Landers and others. The witness heard the parties talking about horse tracks, but did not see the track of but one horse himself. That track was between Catfish and Coon creeks. The party struck Coon creek two and a half miles above Cummings's crossing, and searched down the creek. They ate their dinner at Cummings's crossing, and proceeded down the creek three miles to the big lake, where they found the body. From the lake to defendant's house was from six to eight miles. From where the witness, Hanks and Pickel struck Coon creek to the defendant's house by the big lake, the distance was at least twelve miles. This being true, the defendant, to have struck the creek at the point where the searching party did, and have gone home by the big lake, would have had to travel at least twenty-four miles. The witness was a step-son of the witness Dunlap.

John Hallum testified, for the defense, that he was on the last search for the body, and was present when the horse tracks were

claimed to have been found. He saw the tracks of a good many horses. Some one proposed to follow those tracks. Witness suggested the folly of such course, in view of the presence in the woods of so many loose horses. He heard nothing more about horse tracks. The party struck Coon creek a mile or more above Cummings's crossing, ate dinner at the crossing, and went thence to the big lake, about four miles below, and found the dead body. Defendant lived southeast of the lake, some six or eight miles. From the point on Coon creek, where the party struck it, to the defendant's house, by way of the lake, was at least twelve miles. Witness was at the defendant's house a day or two before Pitman disappeared. Mr. Mershon was then there. If anything was then said about the defendant having bought Pitman's crop, witness could not remember it, but it was then the witness's understanding that the defendant had either made the purchase or was then negotiating for the purchase. There was a rumor prevalent at that time that Pitman and his wife lived unhappily together. Witness knew the pipe smoked by Pitman. His pipe had no swallow-fork broken out of the front of it, but the bowl was broken. Witness lived within a mile from the defendant. Defendant was a very thrifty man, cultivated two farms, from both of which he derived a revenue, and frequently had money. Witness would not have thought that defendant had as much as $300 in August, 1884. Witness saw the defendant while he was at large after the jail delivery. Defendant then told witness that he was going back to custody, and he did go back a day or two later. Witness saw the body that was found. It was a white body. Pitman was a black negro. Witness looked at but did not closely examine the holes in the breast. He could not tell how those holes were made. A short time before the negro George disappeared, the defendant paid the witness $100 on a debt.

Cross-examined, the witness testified that the money paid by defendant to him was the last payment on a tract of land. Defendant owned thirty or thirty-five head of cattle, two or three horses and some hogs. He had made no sale of that property that the witness had ever heard of.

Re-examined, the witness said that a conversation may have taken place between Mershon and defendant in his presence, and he not have heard it, or he may have heard and forgotten it. Mershon was paying eight and ten dollars per head for cattle in 1882, perhaps more. Witness knew nothing about the defendant selling his cattle and horses about the time of Pitman's disappearance, but the cattle were taken from the neighborhood shortly afterwards.

John Landers testified, for the defense, that a short time before Pitman disappeared he had a quarrel and fight with Allston Reynolds. They did not fight very much. Reynolds had his hoe in his hands, but did not use it. Witness made them stop fighting. The row was about George's wife.

Cross-examined, witness said that Allston Reynolds was a one-armed negro. Witness heard no serious threats uttered at the time of the fight. Witness saw the body and noticed, but did not examine, the holes in the breast.

Doctor J. L. Bond testified as a medical expert, for the defense, that a body lying in the water twelve or fifteen days in the month of August would putrify. A negro's body would not be turned either white or copper-color by the action of the water — that is, it would not fade the color of the skin. The coloring matter of a negro, called technically the *rete muscolum*, lies beneath the *epidermis* and is held in place by the nerves, sweat-vessels, etc. The mere action of the water, even if the body be in a state of decomposition, would not remove the *epidermis*, but external force would — how much, was a matter of pure experiment. During the witness's career at college the body of a negro woman was placed in a vat of water, and it remained there for months, the color unchanged. It was in no wise probable that the submerging of a negro body in water for a period of twelve or fifteen days would change the color. Mere soaking in water would not remove the *epidermis*. The friction of clothing might exert some influence towards removing the *epidermis*, but the body or clothing must be moving to exert influence enough to remove the coloring matter from a negro's body. Simply floating in a stagnant lake would not do it.

Cross-examined, the witness stated that the coloring matter pertained principally to the middle layer of a negro's skin, with perhaps a little adhering to the first skin. Decomposition would doubtless have some effect in loosening the skin, and sufficient friction would remove the "scurf" skin. If all the coloring matter is removed from a negro body, the body would be white, but the skin left would present a raw appearance. If the parts on a body were tightly secured, they would aid to preserve the skin, but if loose, they would doubtless aid in removing the outside skin, by means of friction.

Joe Richardson, colored, testified for the defense that he and Isadore Richardson went to Coon creek with Doctor Cook, and exhumed the body buried there, which was the body taken from the big lake, and which is referred to in the preceding testimony in this

case. This was done about February 1, 1885. Witness was sent with Doctor Cook by the defendant. Witness dug into the grave until the bones were found, when every spadeful of dirt was carefully examined by passing the same through the fingers. Witness took up the dirt in small spadefuls, to a distance of six inches below the bones, and Doctor Cook examined the dirt with his fingers. Not a single bullet was found. Witness saw Doctor Cook examine the bones, none of which were broken, except at the end of one of the arms. The breast bone and the ribs joining it were not touched by a bullet. Mr. W. L. Faulk, the defendant's attorney, was present. Some hair, which looked like the hair of a white man, was found. Doctor Cook took charge of it.

Cross-examined, the witness said that no flesh was adhering to the bones when they were dug up. The head was not found in the grave. Witness remembered no feet bones, but thought some hand bones were found. The leg bones were in the grave. Doctor Cook put the bones together. It was possible, perhaps, but barely probable, that some one or more small clods might have been turned up with a bullet. The soil at the grave was soft sand, and would not clod. Witness had never told anybody about that day's work, nor did he tell anybody on that day, when he started to the grave, where he was going, nor, after he came back, where he had been. The hair found in the grave was very near straight,— a little curled perhaps. The bones were re-buried in the same grave.

Doctor R. F. Cook testified, for the defense, that he superintended the exhumation of the body mentioned by the last witness. Defendant employed witness to perform that service, and directed him to search carefully for bullets, and to make any other examination which appeared to him essential. W. L. Faulk went with witness and Joe Richardson. They went by the house of Isadore Richardson and got him to go along and pilot them to the grave of the body. Joe Richardson dug down to the bones, and the dirt, after they were reached, was taken out in spadefuls, and each and every spadeful was passed by witness carefully through his fingers, and not a single bullet was found. If any bullets had been there in that grave they would most certainly have been found by the witness. The head was not in the grave. Some of the hand bones were found. The breast-bone and all of the ribs were perfectly sound without a single hole through them. One rib was broken on the back side, but could not have been broken in the manner it was by a bullet. It seemed to have been broken by some one with the hand, and witness thought that it was broken at the time the body

was buried.   If it had been broken by a bullet the witness would
have been able to detect a sign of the bullet.    The right arm bone
was broken about an inch and a half above the wrist.    A fragment
was broken off diagonally.    Witness could tell very near the height
of a man by the length of his arm.    The arm on the body meas-
ured twenty-one and a half inches from one extreme to the other.
That of Joe Richardson measured twenty-three inches.    Witness ·
estimated the height of the body in life at five feet eight inches.
The arms of a negro are proportionably longer than those of a
white man.    Just beneath where the old pants buttoned around the
body, the witness found some hair, which has been in his possession
ever since, and has been carried in his money purse.    The hair, here
exhibited to the jury, was, in the opinion of the witness, the hair
of a white man.    It was entirely too straight to be negro wool.
Witness did not think it possible for the body of a black negro to
turn white by floating about in water for twelve days.   Witness
was perfectly sure that it would not turn white all over.    Witness
knew that the bodies of negroes, during the war, floated in the
Arkansas river for weeks without turning white.    Witness had oc-
ular knowledge of that fact.    It requires external force to remove
the cuticle to such a depth as to destroy the color-matter of a negro.
Witness was paid $20 for his services, and understood that he was
not to talk about the matter until he testified in court.    Witness
had not mentioned his search in the grave for bullets until he told
Doctor Bond about it on the day before this trial.

Cross-examined, the witness said that the body was exhumed be-
fore the Henderson county jail delivery.    Decomposition might, in
the opinion of the witness, discolor hair.   He did not think that the
kinky hair of a negro would, under any influence, become straight
like the hair exhibited.    Negro wool grew in knots or wads, and
would not straighten out by being buried.    Witness was somewhat
familiar with the use of shot-guns.    He thought that a shot-gun,
to place seven buck shot within the space covered by a human breast,
would have to be fired at a distance not exceeding fifteen paces,
and, if fired from that distance, the shot would certainly be forced
through the body.    Some guns do not, however, scatter as much as
others, and some do not shoot with as great force as others.    The
defense closed.

Doctor P. E. A. Williams was recalled by the State.    He testified
that one of the effects of strychnine taken internally was to create
thirst.    There was a division between the thorax and the abdomen
which decomposes just as any other portion of the inside.    Nitrate

of silver on hair will turn it black and then sandy. Hair will decompose. After ten or twelve days the lungs and the muscular division between the thoracic and abdominal cavities would, in the witness's opinion, be sufficiently decomposed to admit of their being pulled out through holes in the stomach.

Doctor C. R. Johnson testified, for the State, that the cuticle was easily removed from a body after decomposition has set in, if the body has been in the water for some time. Witness thought it would come off in water of itself, but at all events it would require but very slight force to remove it. The coloring matter of a negro is underneath the cuticle, and is held in place by muscles, tissues, etc. The effect of nitrate of silver upon hair is to turn it black. The hair would ultimately regain its original color, but would lose its gloss.

The motion for new trial criticised the sufficiency of the evidence to support the verdict.

*W. L. Faulk* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for murder of the first degree, with life sentence in the penitentiary.

The indictment charges that defendant James Lightfoot did kill and murder George Pitman by shooting him with a gun. Two questions of fact are presented for our consideration: First, was George Pitman killed, or, in other words, was the body found in the lake on Coon creek the body of George Pitman? Second, was Pitman shot and killed with a gun, pistol or any other fire-arm?

Without entering upon an elaborate discussion of the evidence in this voluminous record, we simply say that there is great conflict in the evidence bearing upon the first question. A body was found in a lake on Coon creek, which had evidently been there for several days. The head and one foot were off, and the body far advanced toward decomposition. A part of the shirt and the pants still covered the body. One bone of one of the arms was broken, but how we are not informed. There were several holes in the breast, with the appearance as if made by buck shot. The body was white with no black spots on it, either on the exposed parts or on the parts covered by the clothing. The fish or turtles had torn the flesh from the calves of the legs.

George Pitman was a negro of dark copper color,—some of the

witnesses say a *black* negro.  All of the witnesses agree that the body was white.  Dr. Williams says, however, that he believed it to be that of a negro because of the kinky hair obtained from the *scrotum*.  The wife of George Pitman, as well as Dr. Williams, identified the body by certain scars, and the wife by certain patches on the pants.  The size and shape corresponded with that of George Pitman.  These are some of the facts showing identity.

On the other hand, all agreed that the body was white, like that of a white man.  Dr. Cook exhumed the body and found straight hair.  There were no black spots on the body, it being white all over.

While it may be true that, after sufficient decomposition, the *epidermis* may peel off, leaving the body of a negro white, still this would not likely occur beneath the clothing.  Now the coloring matter is not dissolved by the action of the water and carried off in particles.  It is contained in the *epidermis*, and this must be removed to free the skin of its original color.  Take, for instance, a blister produced by a scald or burn, remove the outer skin or *epidermis*, and the part left bare will be white, but the skin removed will be black if originally so.  As above remarked, the coloring matter is not dissolved by the water, nor will the *epidermis* separate or fall free from that which is underneath because of decomposition.  There must be some force applied to remove it.  This may be done by the action of the current or any other force; but we cannot perceive how it was possible that the whole body, that beneath the clothing as well as that which was exposed, could have been stripped of the outer skin.  There certainly would have been some portion of the body still covered with the *epidermis*, or there would evidently have been parcels or patches of the skin adhering to the inside of the pants.

The witnesses say that the body was white,— white all over.  If a negro, this is passing strange indeed.  For we venture the assertion that if it were possible to recognize certain scars produced by burns and blisters, most clearly decomposition had not advanced to such an extent as to completely destroy the *epidermis*.  It seems that the hair around the *scrotum* was still adhering; this would leave the body with the *epidermis*.  Hence we must conclude that portions of this outer skin must have remained, either attached to the body or clothing, and if that of a colored man indeed, this fact could have been easily discovered,— discovered not from uncertain facts and circumstances, such as scars, patches on the pants, and the opinions of witnesses.

Dr. Cook, as before stated, exhumed the body, and it seems that he found straight hair. Dr. Williams says he obtained kinky hair from around the privates,— he calls it wool. It is not at all inconsistent with its being a white man for the hair from this part of the body to be kinky or curly. But on the other hand, it is absolutely impossible for a dark copper-colored negro to have straight hair on any portion of his body.

These are some of the conflicts in the testimony bearing upon the identity of the deceased, and we very seriously doubt, from the whole evidence, whether the body found was that of Pitman. And, notwithstanding the evidence of Dr. Williams and Mrs. Pitman, when viewed as a whole, my brother Wilson and I do not think the evidence sufficient to establish the identity of the body found in the lake as that of Pitman, the party charged to have been murdered. Our presiding judge, however, thinks it sufficient.

The second question is, do the facts show that the body found came to its death from a gun or pistol shot wound. If not, this conviction cannot stand, for this being alleged it must be proved.

What is the evidence upon this point? Dr. Williams says "that there were six or seven holes in the breast; that he *thinks* that they were made by buck shot; went straight in; that he probed the holes with a stick six or seven inches,— penetrated into the lungs; that the stick met with no resistance; that there was a large hole about the pit of the stomach, where the buzzards had apparently picked or dragged out entrails. There were no holes on the back of the body, and if it was shot none of the holes came through; can't say whether any of the ribs or the breast bone were broken or not. The balls could have passed through without breaking any bones."

M. C. Cummings says: "I examined the body tolerably well. There were some holes in the breast; could not tell how they were made; the body had been dead a long time, and was soft enough for buzzards to have driven their beaks through; don't think any bones were broken. I sounded the breast to see if any bones were broken, and if any were broken I could not discover it. No holes were through on the back. If the holes were made with shot-gun, party shooting could not have been over ten or fifteen steps away, and if the holes had been made with a gun the shot certainly would have gone through, and would have broken the ribs and breast bone. This depends on the gun and the manner of its use," etc.

M. Nicodemus says: "There were two or three holes in the breast; don't know how they were made; don't know whether the buzzards could have made them or not; holes in the breast looked like bullet

holes, rather larger than bullet holes." D. D. Hanks says: "There were what appeared to be holes in the breast. Can't say how the body came to its death." W. M. Pickel says: "There were some holes in the breast. Can't tell how the body came to its death. Can't say whether the holes in the breast were bullet holes or not. I could not tell from looking."

Defendant's witnesses testify as follows on that point: John Hallum (white): "I didn't examine holes closely; looked at them; couldn't tell how made." John Landers: "Saw holes in the breast, but did not examine them."

Here we have six or seven holes in the breast of the body; some of the witnesses thought they looked like they were made by buck shot, but the greater number could not say by what means they were made. In fact, the sum and substance of this evidence is merely matter of opinion on either side.

We have some evidence, not consisting of opinions merely, but of stubborn facts. All agree that, if shot, the balls remained in the body, for none went through. About the 1st of February, 1885, Dr. Cook, with Joe Richardson and Isadore Richardson, went to the grave and exhumed the body. We will let him tell the result of the examination. He says:

"Joe Richardson dug down until he struck the bones, and we took out carefully and examined with my fingers each and every spadeful of dirt carefully, and there were no bullets in there; there were no bullets there or we could have found them. The breast bones and all of the front ribs were perfectly sound; not a hole through them. On the back side one rib was broken, but could not have been done with a bullet; there was no sign of a bullet. If it had been broken by a bullet I could have seen the sign of it. The arm bone, I think, of the right arm about one or one and a half inches above the wrist joint was broken, that is, the inside bone. It was broken off diagonally."

Now here we have facts, not opinions or speculations, but stubborn facts, and if true, evidently the deceased was not killed by being shot. After a most careful examination no balls could be found, which were unquestionably in the grave if the deceased was shot at all, for all agree that they did not pass out.

Again, notwithstanding Dr. Williams states that it is possible to shoot six or seven balls into and through the breast without breaking or cutting a bone or rib, we are equally confident that it is a physical impossibility; or, if possible, certainly not at all probable. We therefore believe that these facts, though of a negative char-

acter, most clearly demonstrate, conceding that deceased came to his death by violence, that the means used to effect his death was not by shooting; and as the State has alleged this means, she is bound by it, and must prove the means as alleged.

We are therefore of the opinion that the verdict and judgment are not supported by the proof, and hence the judgment must be reversed and the case remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 16, 1885.]